HDM/DJ:PJC/KML
F.# 2021R01058

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

PERRY FRANKEL,

          Defendant.

- - - - - - - - - - - -X

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 27 2023   ★

LONG ISLAND OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 22-180 (S-1) (JS)
(T. 18, U.S.C., §§ 982(a)(1),
982(a)(7), 982(b)(1), 1347, 1957(a),
1957(b), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    Background

    A.    The Medicare and Medicaid Programs

        1.    The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

        2.    Medicare was divided into multiple parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare Part B covered outpatient hospital services and professional services provided by physicians and other providers (individually, "Provider," and collectively, "Providers").

3.     Medicare Part C—also known as Medicare Advantage—offered beneficiaries the opportunity to secure coverage from private insurers ("Contractors") for many of the same services that were provided by Parts A and B, in addition to certain mandatory and optional supplemental benefits.

4.     CMS provided fixed, monthly payments to the Contractors for each beneficiary enrolled in a Medicare Advantage plan administered by the Contractors.   These monthly payments were referred to as "capitation" payments.   To obtain payment for treatment or services provided to a beneficiary enrolled in a Medicare Advantage plan, health care providers submitted itemized claim forms to the Contractors.

5.     The Medicaid Program ("Medicaid") in New York State was a federally and state funded health care program providing benefits to individuals and families who met specified financial and other eligibility requirements and certain other individuals who lacked adequate resources to pay for medical care.   CMS was responsible for overseeing the Medicaid program.   Individuals who received benefits under Medicaid, like those who received benefits under Medicare, were referred to as "beneficiaries."

6.     Medicaid covered the costs of physicians' services and outpatient care, among other services.

7.     In New York State, Medicaid offered a managed care delivery system to provide Medicaid benefits to eligible beneficiaries called Medicaid Managed Care.   Under Medicaid Managed Care, private entities referred to as managed care organizations provided insurance plans covering most Medicaid benefits to eligible beneficiaries in exchange for monthly payments from New York State.

8.      Various private insurers participated in Medicare Part C as Contractors and offered eligible participants, referred to as "members," the opportunity to enroll in Medicare Advantage plans.   These private insurers also participated in New York's Medicaid Managed Care plans.

9.      Various private insurers offered commercial health insurance plans for individuals and families throughout New York State ("Private Plans").   A medical provider must have been enrolled with the Private Insurers as a participating provider in order to submit claims for medical services.

10.      Medicare, Medicare Advantage plans, Medicaid Managed Care plans and Private Plans were "health care benefit program[s]" as defined by Title 18, United States Code, Section 24(b).

11.      CMS assigned Providers a unique national provider identifier ("NPI") number.   A Provider used its assigned NPI number when submitting claims for reimbursement to Medicare, Medicare Advantage plans, Medicaid Managed Care plans and Private Plans (collectively, the "Health Care Benefit Programs").

12.      A Provider was required to be enrolled with the Health Care Benefit Programs in order to submit claims.   To enroll in Medicare, a Provider was required to enter into an agreement with CMS in which the Provider agreed to comply with all applicable statutory, regulatory and program requirements for reimbursement from Medicare.   By signing the Medicare enrollment application, the Provider certified that the Provider understood that payment of a claim was conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions and federal law, and on the Provider's compliance with all application conditions of participation in Medicare.   A similar agreement

3

was required of Providers enrolled in Medicare Advantage plans, Medicaid Managed Care plans and Private Plans.

13.     Providers were authorized to submit claims to the Health Care Benefit Programs only for services that were medically necessary and actually provided to the beneficiaries and members.

14.     In order to receive payment for a service covered by the Health Care Benefit Programs, the Provider was required to submit a claim for payment electronically or in writing.   The claim required the Provider to identify, among other information: the Provider submitting the claim; the Provider providing the service; the beneficiary or member; the services rendered; the diagnosis or nature of the illness or condition treated; and the date or dates of service.

15.     The Health Care Benefit Programs paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented and actually provided as represented.

B.     CPT Codes for Evaluation and Management Services

16.     A claim to the Health Care Benefit Programs identified the service or services provided using billing codes, also known as current procedural terminology codes ("CPT Codes"), which specifically identified the medical service or services provided to beneficiaries or members.

17.     The Health Care Benefit Programs covered evaluation and management services or "office visits" when certain requirements were met.   The CPT Codes for evaluation and management services were organized into various categories and levels.   In general, the

4

more complex the visit, the higher the level of reimbursement from insurance.   To bill using any

CPT Code, the services furnished must have met the definition of the CPT Code.

18.     Prior to January 1, 2021, CPT Code 99202 was a code used to identify an

office or other outpatient visit for the evaluation and management of a new patient, which

required three key components: an expanded problem focused history; an expanded problem

focused examination; and straightforward medical decision making.   The description of CPT

Code 99202 indicated that: (a) usually, the presenting problem(s) were of low to moderate

severity; and (b) typically, 20 minutes were spent face-to-face with the patient and/or family.

19.     Beginning on January 1, 2021, CPT Code 99202 was a code used to

identify an office or other outpatient visit for the evaluation and management of a new

patient, which required a medically appropriate history and/or examination and straightforward

medical decision making.   When selecting CPT Code 99202 based on time spent on the date of

the encounter, the code indicated that a total of 15–29 minutes was spent.

20.     Prior to January 1, 2021, CPT Code 99212 was a code used to identify an

office or other outpatient visit for the evaluation and management of an established patient,

which required at least two of the following three key components: a problem focused history; a

problem focused examination; and straightforward medical decision making.   The description of

CPT Code 99212 indicated that: (a) usually, the presenting problem(s) were self-limited or

minor; and (b) typically, 10 minutes were spent face-to-face with the patient and/or family.

21.     Beginning on January 1, 2021, CPT Code 99212 was a code used to

identify an office or other outpatient visit for the evaluation and management of an established

patient, which required a medically appropriate history and/or examination and straightforward

medical decision making.   When selecting CPT Code 99212 based on time spent on the date of the encounter, the code indicated that a total of 10–19 minutes was spent.

22.     Prior to January 1, 2021, CPT Code 99213 was a code used to identify an office or other outpatient visit for the evaluation and management of an established patient, which required at least two of the following three key components: an expanded problem focused history; an expanded problem focused examination; and medical decision making of low complexity.   The description of CPT Code 99213 indicated that: (a) usually, the presenting problem(s) were of low to moderate severity; and (b) typically, 15 minutes were spent face-to-face with the patient and/or family.

23.     Beginning on January 1, 2021, CPT Code 99213 was a code used to identify an office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and low level of medical decision making.   When selecting CPT Code 99213 based on time spent on the date of the encounter, the code indicated that a total of 20–29 minutes was spent.

C.     The Defendant and Relevant Entities

24.     The defendant PERRY FRANKEL was a medical doctor who was licensed by the State of New York and whose principal area of practice was cardiology. FRANKEL was the owner of Advanced Cardiovascular Diagnostics, PLLC ("Advanced Cardio"), a New York State professional services limited liability company.   FRANKEL was a signatory on bank accounts ending in 6386 ("Account x6386") and 6408 ("Account x6408") held at Financial Institution-1, an entity the identity of which is known to the Grand Jury.

25.     Advanced Cardio was a cardiology practice located in Great Neck, New York.   Advanced Cardio also operated numerous mobile COVID-19 testing sites throughout Long Island, New York.

26.     Insurer-1, an entity the identity of which is known to the Grand Jury, was a private insurance company with operations in New York State.   Insurer-1 offered Medicare Advantage plans, Medicaid Managed Care plans and Private Plans to eligible individuals within New York State and elsewhere.

27.     Insurer-2, an entity the identity of which is known to the Grand Jury, was a private insurance company with operations in New York State.   Insurer-2 offered Medicare Advantage plans, Medicaid Managed Care plans and Private Plans to eligible individuals within New York State and elsewhere.

28.     Insurer-3, an entity the identity of which is known to the Grand Jury, was a private insurance company with operations in New York State.   Insurer-3 offered Medicare Advantage plans and Private Plans to eligible individuals within New York State and elsewhere.

29.     Insurer-4, an entity the identity of which is known to the Grand Jury, was a private insurance company with operations in New York State.   Insurer-4 offered Private Plans to eligible individuals within New York State and elsewhere.

II.     The Fraudulent Scheme

30.     From approximately September 2020 to approximately March 2022, the defendant PERRY FRANKEL, together with others, submitted and caused the submission of false and fraudulent claims to the Health Care Benefit Programs for evaluation and management services during the COVID-19 pandemic that were medically unnecessary, not provided as represented and ineligible for reimbursement.

7

31.     Specifically, the defendant PERRY FRANKEL took advantage of the COVID-19 pandemic for his own financial gain.   FRANKEL operated numerous mobile COVID-19 testing sites at various locations throughout Long Island, New York (collectively, the "Mobile Testing Sites"), and caused the Mobile Testing Sites to offer COVID-19 testing to members of the public, as the effects of the COVID-19 pandemic were felt in the United States and many individuals were reporting difficulty obtaining tests to determine whether they were infected with the COVID-19 virus.

32.     The Mobile Testing Sites were staffed in some instances with mid-level providers, including nurse practitioners and physicians' assistants and/or, in some instances, medical assistants and COVID-19 swabbers.   Beneficiaries and members visited the mobile COVID-19 testing sites to be tested for COVID-19 and briefly met with medical assistants and swabbers and sometimes nurse practitioners and physicians' assistants, who typically interacted with beneficiaries and members for less than five minutes, which included collecting insurance information, asking beneficiaries and members whether they had COVID-19 symptoms and administering a nasal swab for COVID-19 testing.   Often, beneficiaries and members remained in their cars during the testing process.   Beneficiaries and members at the Mobile Testing Sites did not receive evaluation and management services as defined in CPT Codes 99202, 99212, and 99213.

33.     The defendant PERRY FRANKEL certified to Medicare that he would comply with all Medicare rules and regulations and federal laws, including, among other things, that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

34.     The defendant PERRY FRANKEL submitted or caused the submission of false and fraudulent claims to the Health Care Benefit Programs using CPT Codes 99202, 99212 and 99213, seeking payments for evaluation and management services for beneficiaries and members who received COVID-19 tests from the Mobile Testing Sites, when, in fact, these evaluation and management services were not provided.   For some claims, FRANKEL was not in New York State on the dates he purportedly provided evaluation and management services at the Mobile Testing Sites.

35.     The defendant PERRY FRANKEL was listed as the rendering provider for all of the evaluation and management services purportedly provided at the Mobile Testing Sites, even though he did not, in fact, provide these services.

36.     From approximately September 2020 to approximately March 2022, the defendant PERRY FRANKEL submitted and caused to be submitted approximately $17 million in claims to the Health Care Benefit Programs for evaluation and management services in connection with COVID-19 testing that was medically unnecessary, not provided as represented and ineligible for reimbursement, for which the Health Care Benefit Programs paid approximately $3 million.

COUNTS ONE THROUGH FIVE
(Health Care Fraud)

37.     The allegations contained in paragraphs one through 36 are realleged and incorporated as if fully set forth in this paragraph.

38.     In or about and between September 2020 and March 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PERRY FRANKEL, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Health Care Benefit Programs, which

9

were health care benefit programs, as that term is defined under Title 18, United States Code, Section 24(b), and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of the Health Care Benefit Programs, in connection with the delivery of and payment for health care benefits, items and services.

39.     On or about the dates specified below, within the Eastern District of New York and elsewhere, the defendant PERRY FRANKEL, together with others, submitted and caused to be submitted the following false and fraudulent claims to the Health Care Benefit Programs for evaluation and management services that were not medically necessary, not provided as represented and ineligible for reimbursement, in an attempt to execute, and in execution of, the scheme described above:

| Count | Beneficiary / Member | Insurer | Approximate Date of Service | Procedure Code | Approximate Amount Billed |
|-------|----------------------|---------|------------------------------|----------------|----------------------------|
| ONE | Individual-1, an individual whose identity is known to the Grand Jury | Medicare | March 23, 2021 | CPT 99202 | $250.00 |
| TWO | Individual-2, and individual whose identity is known to the Grand Jury | Insurer-3 | March 23, 2021 | CPT 99212 | $200.00 |
| THREE | Individual-3, an individual whose identity is known to the Grand Jury | Insurer-1 | May 21, 2021 | CPT 99202 | $250.00 |

| Count | Beneficiary / Member | Insurer | Approximate Date of Service | Procedure Code | Approximate Amount Billed |
|-------|----------------------|---------|----------------------------|----------------|---------------------------|
| FOUR | Individual-4, an individual whose identity is known to the Grand Jury | Insurer-1 | July 1, 2021 | CPT 99202 | $250.00 |
| FIVE | Individual-5, an individual whose identity is known to the Grand Jury | Medicare | November 28, 2021 | CPT 99212 | $200.00 |

(Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

COUNTS SIX THROUGH SEVEN
(Engaging in Unlawful Monetary Transactions)

40.     The allegations contained in paragraphs one through 36 are realleged and incorporated as if fully set forth in this paragraph.

41.     On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendant PERRY FRANKEL, together with others, did knowingly and intentionally engage in one or more monetary transactions, to wit: the transactions set forth below, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the property involved in such monetary transactions represented the proceeds of some form of unlawful activity:

| Count | Approximate Date of Transaction | Description of Transaction |
|-------|--------------------------------|----------------------------|
| SIX | March 12, 2021 | PERRY FRANKEL caused the issuance of a check in the amount of approximately |

| | | $15,000 payable to Miller Motor Cars Inc. from Account x6386 in furtherance of the purchase of a 2021 Bentley Bentayga |
|---|---|---|
| SEVEN | December 13, 2021 | PERRY FRANKEL caused the issuance of a wire transfer in the amount of approximately $125,000 payable to Summit Farms LLC from Account x6408 in furtherance of a payment to an equestrian stable |

(Title 18, United States Code, Sections 1957(a), 1957(b), 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH FIVE

42.    The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offenses.

43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

12

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in the forfeiture allegation.

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS SIX AND SEVEN

44.    The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged in Counts Six and Seven, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

45.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

13

property of the defendant up to the value of the forfeitable property described in this forfeiture

allegation.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))


                   A TRUE BILL

                          _____
                              FOREPERSON


*By Carolyn Pokorny, Assistant U.S. Attorney*
_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


*By PJ Campbell, Trial Attorney*
_____
GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

14

F. #2021R01058

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

PERRY FRANKEL,

Defendant.

# SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 982(a)(7), 982(b)(1), 1347, 1957(a), 1957(b),
2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

*A true bill.*

_____
                                                                                    *Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_____
                                                                                    *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _ _

*Patrick J. Campbell and Kelly M. Lyons, DOJ Trial Attorneys, (718) 254-6366*